**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **ROGER PEIKIN** | | **:** | **CIVIL ACTION** |
| | **Plaintiff** | **:** | |
| **v.** | | **:** | |
| | | **:** | |
| **JOSHUA HIRSHEY and** | | **:** | |
| **JULIE HIRSHEY** | | **:** | |
| | **Defendants** | **:** | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.    INTRODUCTION

Plaintiff, Roger Peikin, brings this Civil Action to recover compensatory and punitive damages in excess of $75,000 arising from the egregious harm inflicted by the defendants, Joshua and Julie Hirshey, on Villawood, plaintiff's pristine, architecturally significant and fully furnished home located in a prime area of Philadelphia's Main Line. Mr. Peikin devoted three years to designing and building the Federal style mansion, sparing no expense.  He positioned the home on an engineered knoll as a design feature, to give the impression that it is the oldest home in the area, with the surrounding properties having grown up around it over the past two centuries.

The home and its contents had been lovingly cared for and curated by the plaintiff, who rented the home to defendants expecting them to respect the timeless beauty of the structure together with the custom made and historical items that furnished it. Instead, Joshua and Julie Hirshey trashed the home as if it were disposable -- ruining moldings, gouging furniture, allowing their dogs to urinate on custom floor rugs, and even leaving behind bloody mattresses that a clean-out crew hired by plaintiff refused to touch. It fell upon Mr. Peikin and his workers to repair, remediate and disinfect defendants' recreation of the Augean Stables.  Defendants' misconduct not

only breached the Lease and forced plaintiff to incur more than $75,000 in out-of-pocket costs, but also inflicted serious emotional distress on Mr. Peikin, who was forced to see a home into which he had poured much time and treasure be reduced to a filthy, broken and unrentable mess.  In further support of this Complaint, which seeks to hold defendants accountable for their complete lack of responsibility, plaintiff states as follows:

## II.     PARTIES

1.      Plaintiff, Roger Peikin ("Plaintiff" or "Mr. Peikin") is an adult individual and resident of the State of California with a street address of 635 14th Street, Santa Monica, California  90402, Los Angeles County.

2.      Defendants, Joshua Hirshey and Julie Hirshey ("Defendants") are adult individuals, believed to be husband and wife, with a current address of 403 Fairview Road, Penn Valley, Pennsylvania 19072, Montgomery County.

## III.    JURISDICTION and VENUE

3.      This United States District Court has jurisdiction over the claims asserted by this Complaint pursuant to 28 U.S.C. § 1332 (a)(1), because the damages sought by plaintiff exceed the value of $75,000, exclusive of interest and costs, and this action is between citizens of different states, namely California (plaintiff) and Pennsylvania (both defendants).

4.      Venue of this action is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 (a)(1)-(2), because this District is where: (i) both defendants reside; (ii) the events or omissions giving rise to the claim occurred; and (iii) the property that is a subject of this action is situated.

IV.     **FACTUAL BACKGROUND**

A.     **The Lease**

5.     Plaintiff is the fee simple owner of Villawood, a multimillion dollar, custom home located at 1911 Stone Ridge Lane, Villanova, Pennsylvania 19085, Montgomery County (the "Property").

6.     On or about July 22, 2022, Defendants Joshua Hirshey, an attorney, and Julie Hirshey, a Vice President with the Philadelphia Eagles football team, signed a lease to rent the Property (the "Lease") due to construction that was occurring at Defendants' residence in Penn Valley.  See Exhibit A (fully executed Lease).

7.     The monthly rent under the Lease was $10,900.00.  Section 16 of the Lease identifies the utilities and services for which Plaintiff and Defendants were each responsible.  Defendants' responsibilities included paying for gas, electric, water, and monthly pool services.  See Exhibit A at § 16.

8.     The Lease required a security deposit of $10,900.00, a Utilities Deposit of $5,000.00 with periodic replenishment, and a Pet Deposit of $3,000.00, all of which the Defendants paid.  Plaintiff believes that the funds for these payments had been provided by Defendant's insurance carrier, to temporarily relocate them as a result of damage that had been sustained by Defendants' residence.

9.     Section 17 of the Lease spelled out Defendants' additional duties, including but not limited to keeping the Property clean and safe, to notify Mr. Peikin immediately of any repairs needed, to refrain from damaging or defacing any part of the Property, and other material obligations.  See Exhibit A at § 17.

10.    Section 24 of the Lease provided that Defendants would be responsible for landlord's reasonable attorneys' fees incurred in connection with enforcement of the Lease, including any necessary litigation.  See id. at § 24 (A)(4).

11.    The initial Lease term began on July 23, 2022 and ended on April 30, 2023.

**B.    The Property**

12.    As summarized by the Introduction to this Complaint, Mr. Peikin had invested significant amounts of money into making the Property an inviting and luxurious home before the defendants moved in on July 23, 2022.  Plaintiff had retained an interior decorator, Joseph Berkowitz, and with his professional guidance, had acquired numerous items of expensive furniture, gorgeous rugs, a Wolf stove, designer appliances, and other high-end items, many of which were custom orders for the Property.

13.    Photographs taken of the Property before defendants moved in confirm the thoughtful design, extraordinary fitment, and pristine condition of the premises.  See Exhibits B1 through 10 (Photos of the Property before defendants' move-in).

14.    After Defendants signed the Lease and before they moved into the Property, Mr. Peikin provided Defendants with a four-page word-processed document, an "overview of things to know" about Villawood.  See Exhibit C (House Notes).

15.    Defendants at no time expressed any reluctance or hesitation in response to Mr. Peikin's request that Defendants follow the House Notes.

4

16.     As the end date of the Lease approached, Mr. Peikin extended the
Lease term several times at Defendants' request in order to accommodate the delayed
rebuilding of Defendants' house in Penn Valley.

17.     Ultimately, the Lease was extended (again at Defendants' request)
to August 31, 2023 and Defendants vacated the Property afterwards.

### C.     The Aftermath

18.     Mr. Peikin and his leasing agent each inspected the Property
before and after Defendants' move-out, and at that time found significant, indeed
horrifying damage inflicted by them.  Mr. Berkowitz (the interior designer who was
involved from the beginning of the house-building process and coordinated the entirety
of furniture, furnishings, finishes, and installation processes) likewise inspected the
property before, during, and after Defendants' occupancy.

19.      Defendants caused substantial and frequently irreparable damage
to the pool, doors, furniture, floors, appliances, and other items, all of which had been in
pristine, original condition before Defendants moved in.  Further details follow.

(i)     <u>The Pool became unusable.</u>

20.     Defendants failed to maintain the Pool as the Lease required, by
actively prohibiting regular access to it by the pool service company.  That same
company had participated in the design of this unique, fully mosaic-tiled indoor pool
during the house-building process and had maintained and serviced the pool since the
house was completed. There was absolutely no reason for Defendants to block access
for pool maintenance, especially where the House Notes advised that "the pool guy

from Outer Spaces comes periodically to service the pool, generally twice a month."
See Exhibit C at 2.

21.    Disregarding the high levels of design and craftsmanship that had
been devoted to the pool, the Defendants left it filled with filthy water, which became
covered by green pond scum.  See Exhibits D1 through D4 (Photos of the pool as
Defendants left it).

22.    Defendants' neglect resulted in the pool turning into an opaque,
greenish pond with growth on the underside of the electric pool cover and throughout
the entire pool system, resulting in thousands of dollars of damage.  Remediation
required placing equipment to completely drain the pool to the outside, sanitization and
hand-scrubbing the entire pool and cover by multiple workers, sanitization and cleaning
of all equipment, and refilling and treating the new fresh water.  See Exhibit D5 (Photo
of the pool after "multi-day draining, scrubbing and sanitizing").

(ii)    Formal Dining Room and Custom Kitchen -- ruined

23.    Defendants showed similar contempt for beautiful craftsmanship
elsewhere on the Property.  They used the formal dining room, appointed with a
stunning lacquer dining table, as a home office, inflicting deep gouges, scratches, and
chips to the formal dining table that required thousands of dollars to repair.  See
Exhibits E14 through E16.[1]

24.    Defendants caused this damage despite the clear written
instructions that Mr. Peikin had provided prior to commencement of the Lease, as

---

[1] Certain of plaintiff's numbered exhibits are not attached to this Complaint due to ECF file size limitations.
Plaintiff will timely provide the full set of numbered exhibits (which also include videos) to defendants or
their counsel as part of plaintiff's Initial Disclosures.

6

follows: "In the pantry closet are also custom pads that were made for the formal dining room lacquer table, and a tablecloth as well.  Please use the pads before putting down heavy or hot serving trays or anything with feet, or just leave them on all the time if you prefer."  <u>See</u> Exhibit C at 3.

25.     Defendants had their printers, computers, various trial boxes, and other office equipment set up and strewn across the custom lacquer dining table, as well as on other valuable furniture in the formal dining room and on the custom rug. Defendants also ink-stained the custom sofa and chairs with colored pens that were on the dining room table as part of their "office" set up, and chipped several of the custom upholstered lacquer dining room chairs.  <u>See</u> Exhibits E19 through E23.

26.     Incredibly, Defendants had also lined up free weight dumbbells across the deep custom wood window casements despite the fact that the Property had an onsite gym on the second floor that was specifically designed for free weights and other fitness activities.  <u>See</u> Exhibit E24.

27.     Aside from an impromptu office, Defendants also used the formal dining room and attached custom kitchen with seating area as a dog run, with dog chew toys and bones found scattered throughout the dining room.  <u>See</u> Exhibits F3 through F10.

28.     The custom dining room rug that had been painstakingly secured in place was chewed and urinated on by Defendants' dogs, and then discolored with orange/red bleach marks from Defendants' botched attempts at superficial cleaning – one does not clean a valuable area rug with bleach. As itemized in more detail below,

7

Mr. Peikin spent thousands of dollars to replace this rug, which was practically new when Defendants destroyed it.  See Exhibits E3 and E9.

29.     Defendants also allowed their dogs to chew the formal dining table pedestal legs, chew and scratch through the screen door to the outside terrace, and then scratch and gouge the exterior door leading from the terrace. The gouging, which Defendants evidently made no effort to stop, went deep into the door and the wood casement surrounding  it, requiring specialized repair.  See Exhibits F1 through F2 (dining table); Exhibits F3 through F10 (dog damage).

30.     The dogs also inflicted visible scratch marks into extensive areas of hardwood flooring, causing damage that the current tenants of the home have mentioned to Mr. Peikin on more than one occasion. Mr. Peikin is in the process of obtaining an estimate to repair and refinish this aspect of the pervasive damage to Villawood.

31.     The list goes on.  Defendants ruined the custom kitchen table with scratches and heat marks necessitating that it be stripped and refinished.  Defendants also caused one of the two kitchen sink ¾ horsepower garbage disposals to become seized, inoperative and unrepairable by grinding a metal utensil into the motor. Metal on metal creates a significant amount of noise, which Defendants somehow managed to ignore.

32.     The foul-smelling backup that resulted from the compromised ability of the sink to drain with a broken disposer apparently also escaped Defendants' notice.

33.     Defendants' misuse and apparent inability to clean made the high-end Wolf kitchen range griddle and grill rusted and unusable, unable to be restored

notwithstanding extended efforts to repair and revive it.  <u>See</u> Exhibit G1 (Photo of damaged Wolf griddle).

(iii) <u>Defendants damaged every other room they occupied</u>.

34.  Unfortunately, the list continues.  Defendants caused significant damage to the first floor library, leaving stains on the carpet, gouges in leather wallpaper and the mahogany wall, and significant scratches to furniture.  The custom tufted sofa was left with the upholstery completely ruined.  <u>See</u> Exhibits H1 through H6 (Photos of library damage).

35.  Defendants left the first floor master suite with stains on the carpet, ink stains on the custom study chair, and ripped the fabric from a sitting area chair, costing thousands of additional dollars to repair this willful damage.  <u>See</u> Exhibits I1 through I6 (Photos of Master Suite damage).

36.  In the second-floor primary master study Defendants gouged the custom desk with some form of inappropriate activity, leaving chips in the surface that required a specialized refinisher to repair.  <u>See</u> Exhibit J.  In a similar manner, Defendants left the bedroom sitting area table with deep scratches that also required specialized repair.  <u>See</u> Exhibit K1.

37.  Defendants left an indelible trail of black ink across one of the guestroom carpets.  <u>See</u> Exhibits L1 through L8.  And in another guestroom, Mr. Peikin discovered what had previously been a newly refinished desk with a leather inlay, reduced to a play space and covered with hardened modeling clay.  <u>See</u> Exhibits M1 through M3.

9

(iv)   <u>Defendants left dirt, stains and even blood in the house.</u>

38.   By means presently unknown (but which will be revealed in discovery), Defendants bloodied several expensive mattresses, which a clean-out crew refused to handle until after Mr. Peikin arranged for them to be wrapped in plastic and bagged.  Thus, defendants did not stop with egregious, willful damage to the home and its contents, but also caused conditions resembling a Hazmat situation.  Replacement of the mattresses, made untouchable by stains from blood and other bodily fluids, cost Mr. Peikin thousands of dollars.

39.   The finely appointed bathrooms appeared to have not been cleaned ever during Defendants' 13-month stay, with splatter, dirt and residue on the mirrors and floors -- deep enough to show dog paw prints.[2]

40.   While the filthy bathrooms were remediable with deep cleaning and sanitization, the deplorable condition in which Defendants left them confirmed Defendants' total disregard for a multimillion dollar custom home paid for by their insurer.  <u>See</u> Exhibits N3 through N4; N6.

41.   Upon departure, defendants left heaps of clothing and shoes in the Master Study, as if a clean-out service had been part of the Lease.  <u>See</u> Exhibits N7 through N8.  Defendants severely stained the chairs in the Master Bedroom sitting area, and also managed to bleach and ruin every bathroom towel in the entire house.  <u>See</u> Exhibit N11.

---

[2] Plaintiff will timely provide video of this condition.

42.     Although Mr. Berkowitz gave Mr. Peikin advance warning of the damage he would encounter at the home after Defendants vacated, nothing could have fully prepared Mr. Peikin for the enormity of the conditions he was about to encounter.

43.     On site, Mr. Peikin descended from initial shock and anger to deep sadness as he went from one damaged room to the next.  No space had been spared, and Mr. Peikin progressively realized the enormity of effort that would be required to bring the house back to the original, pristine condition that it had before the defendants moved in.

**D.     Post-damage communications**

44.     On September 27, 2023, Mr. Peikin e-mailed and also sent to Defendants by First Class Certified Mail a reconciliation of the security deposit, pet deposit, and utilities deposit, after those amounts had been applied to damage sustained by the property, and to the thousands of dollars in utility charges that Defendants refused to pay, although they had full responsibility for these charges under the Lease.  See Exhibit O (Reconciliation with numerous attached receipts).

45.     On September 30, 2023, Mr. Peikin e-mailed Defendants a revised copy of the reconciliation, which was followed by hardcopy sent First Class Certified Mail.  See Exhibit P (Revised Reconciliation). The backup information referenced by the Revised Reconciliation is omitted from this pleading but was provided to Defendants as attachments to the original e-mail and mail of September 30, 2023.

46.     Defendants have failed and refused to pay any of the amounts due as set forth in the Revised Reconciliation. Defendants apparently believe that renting

the Property gave them free license to inflict as much damage on it as they pleased, without consequences beyond the deposits their insurer paid before moving in.

## V.   CAUSES OF ACTION

### A.   Breach of Contract
Roger Peikin v. Joshua and Julie Hirshey

47.   Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

48.   The Lease is a valid and enforceable contract under Pennsylvania law.

49.   Plaintiff has satisfied all of his obligations under the Lease.

50.   The Lease contains two attorney's fee provisions, whereby Mr. Peikin has contractual rights to recover all attorney fees he incurs as a result of the Defendants' breach of the Lease, including the need to repair the Property, and file this Civil Action for redress provided by law.  See Exhibit A at §§ 20 (C) ("Tenant is responsible for any loss to Landlord caused by Tenant, Tenant's family or Tenant's guests, including reasonable attorney's fees associated with that loss, if awarded by a Court"); 24 (A)(4) (including, within "Landlord Remedies," the obligation of "Tenant paying for Landlord's reasonable attorney's fees and costs, if awarded by a Court.").

51.   To date, plaintiff has incurred attorney fees in the amount of $12,095, as the proximate and foreseeable result of Defendants' breach of the Lease.

52.   Defendants had specific responsibilities under the Lease, including duties to keep the Property clean and safe, to notify the landlord immediately of any

repairs needed, to refrain from damaging or defacing any part of the Property, and other obligations.

53.     The Lease also made Defendants responsible for certain utilities and services, including monthly pool maintenance.

54.     As more fully described above, Defendants breached all of the above duties and responsibilities imposed by the Lease, as a result of which Mr. Peikin sustained the following damages:

| | | |
|---|---|---|
| Utility charges unpaid by defendants: | | 4,746.72 |
| Joseph Berkowitz ("JAB") initial time invoice for repairs | | 1,237.50 |
| JAB time estimate to complete outstanding repair items (6 hours not yet invoiced, 6 hours to complete) | | 1,800.00 |
| Patch/paint scuffed walls and nail holes, small guestroom desk cleaning and repair | | 7,135.43 |
| Cleaning supplies | | 179.14 |
| House cleaner | 1,700.00 | |
| less cash from tenant | -220.00 | 1,480.00 |
| Tenant-installed wire fence and metal post removal, haul away and misc. trash | | 318.00 |
| Clear two kitchen drains clogged by tenant | | 605.00 |
| Replace garbage disposal with like-for-like | | |

¾ hp seized due to jammed utensil        834.00

JAB invoice 7633 for:
Professionally clean the following:
ink-stained large guestroom carpet;
first floor master carpet {dog urine stain,
red ink stain); ink-stained upholstery dining
room bench, first floor master sofa, library
sofa; various other items as noted in the
attached invoice.
Replace dining room rug (which was custom
cut and surged in place), chewed and
torn and bleach spots from tenants
trying to remove dog urine and red ink.
Replace screen in kitchen door torn by dog
(screen integral to door - door removed
and taken to shop for repair)        8,168.70

Replace missing kidney pillow from library        385.00

Repair broken tufting stitching and replace
buttons on library sofa        350.00

Library leather wallpaper gouge
(labor only, owner had extra leather
wallpaper in storage)        150.00

Replace king-size mattress in upstairs
master bedroom stained in several places with bodily
fluids; replace king size mattress

in small guest room which appears to be stained with
menstrual blood - workers refused to handle or move
(minimum cost of comparable mattress with haul-away
from local "Mattress Firm"     (2,000 each 4,000.00)

14

Replace Wolf Range griddle                          915.84

Refinish/touch-up the following:

Dining room table due to chips, scratches, gouges, and dog chewing pedestal feet (dining room was used as a dog-run and office desk, custom pads not put down as originally requested by owner until after lacquer table top was substantially damaged); touch-up dents and chips in dining chairs used by tenant for office equipment instead of as a formal dining room; touch-up dented and chipped

kitchen counter stools, chairs, and substantially scratched table; touch-up and fill deep gouge in mahogany butler's pantry adjacent to  library; strip and refinish substantially scratched large cocktail table; strip and refinish substantially scratched large breakfast table at left side upstairs master bedroom sitting  area;

touch-up chips, dents, and scratches in desk and console in upstairs master study; various other items as noted in attached estimate

including $2,000 to wrap and remove several

pieces of furniture to repair in shop and then return   11,970.00
and install

Reupholster ruined first floor master study
fabric desk chair                                   2,160.00

Pool: complete drain and scrub due to
tenant not allowing pool to be serviced

by refusing entry. Refill pool. Multi-day
process for two technicians                         2,283.32

(included in utility reconciliation above along with
Aqua PA water charge to  refill)

**Total repair costs**                              46,435.33

Security Deposit from Defendants:                              10,900.00

Pet Deposit from Defendants:                              3,000.00

Total Deposits                              **13,900.00**

Balance owed for utilities and damage repairs

after deduction of Security Deposit:          <u>**32.535.33**</u>

55.     After sending the Revised Reconciliation to the Defendants, Mr. Peikin

discovered additional damage, in the form of a chair broken by the Defendants that Mr.

Peikin did not initially notice (because he did not attempt to sit on it) that cost Mr. Peikin

$1,015.00 to repair.

56.     In addition, the cost of $2,160 to repair the ruined master study fabric desk

chair listed in the Revised Reconciliation was actually $2,768.80, an increase of

$608.80.  <u>See</u> Exhibit I5-I6 (Photos of ruined chair with seating fabric ripped away).

57.     As a result, the damages total of $32,535.33 provided by the Revised

Reconciliation must be increased by $1,623.80, for a subtotal of $34,159.133, which will

further increase by at least $20,000 based on the need to resurface and then refinish

the extensive areas of hardwood flooring that were damaged by defendants' dogs.

58.     Thus, Plaintiff's minimum costs of repair for the damage inflicted by

Defendants on Villawood total $54,159.33.

59. As a proximate and foreseeable result of Defendants' damage to the premises, Plaintiff was unable to rent the premises for an additional month after Defendants vacated the Property, causing Plaintiff to sustain additional damages in the amount of $12,000.

60. In addition (as stated above), plaintiff has incurred $12,095 in counsel fees as a result of Defendants' breach of the lease.

61. Based on the foregoing, plaintiff's out of pocket damages to date, sustained as a direct and proximate result of Defendants' breach of the Lease, total $78,254.33.

WHEREFORE, plaintiff, Roger Peikin, asks the Court to enter judgment in his favor and against the defendants, Joshua and Julie Hirshey, in an amount in excess of $75,000, together with an award of additional counsel fees to be calculated through entry of judgment, and costs as are allowed by law.

### B. Emotional Distress arising from Wanton and Intentional Acts Roger Peikin v. Joshua and Julie Hirshey

62. Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

63. During the weeks he spent at the Property, helping to remediate the trail of filth and destruction that Defendants left behind, Mr. Peikin experienced significant emotional distress, including racing thoughts, difficulty concentrating, inability to sleep, nausea, feelings of shock and then hopelessness at the situation that confronted him, and prolonged wondering, about how the Defendants could have behaved in such an egregiously thoughtless manner.

17

64.     From the time defendants vacated the Property until new tenants moved in, Mr. Peikin spent many sleepless nights and frustrating, anguish-filled days doing his best to marshal the specialist craftsmen needed to restore the house on an emergency basis.

65.     All the while, Mr. Peikin was constantly mindful of the time of year, and that the window to re-lease the property to avoid even further losses was closing fast.

66.     During this time, Mr. Peikin experienced severe and at times all-consuming stress, which significantly interfered with his ability to focus on work, and get much-needed rest after each day's work was done.

67.     Plaintiffs acted in absolute disregard of Plaintiff's rights, such that an award of punitive damages is both necessary and appropriate.

WHEREFORE, plaintiff, Roger Peikin, asks the Court to enter judgment in his favor and against the defendants, Joshua and Julie Hirshey, for compensatory and punitive damages in an amount in excess of $75,000, together with an award of counsel fees to be calculated through entry of judgment, and costs as are allowed by law.

### C.     Negligence
### Roger Peikin v. Joshua and Julie Hirshey

68.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

69.     As the temporary occupants of Plaintiff's home, which was evidently a high-end, luxury accommodation where plaintiff had spared no expense, the defendants each owed plaintiff duties of reasonable care, to not destroy and/or irreparably damage

18

the home, when engaging in this conduct was completely unnecessary to defendants' quiet enjoyment of the premises.

70.    Defendants should have responded to the opulence of Villawood by at least doing no harm to the premises, but they each failed to observe that minimum duty of reasonable care.

71.    As shown by the foregoing paragraphs of this Complaint, and as further confirmed by the numerous photographic exhibits to this Complaint, defendants breached their respective duties of reasonable care by inflicting severe damage in virtually every room of the house, and to numerous items of custom furniture and fixtures contained therein.

72.    Plaintiff's out of pocket damages to date, sustained as a direct and proximate result of Defendants' breach of their respective duties of reasonable care, total $78,254.33.

WHEREFORE, plaintiff, Roger Peikin, asks the Court to enter judgment in his favor and against the defendants, Joshua and Julie Hirshey, for compensatory and punitive damages in an amount in excess of $75,000, together with an award of counsel fees to be calculated through entry of judgment, and costs as are allowed by law.

## VI.   JURY DEMAND

Plaintiff demands trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38 (b).

Respectfully submitted,

_____
Richard H. Maurer/RHM 4782
Eastburn and Gray, PC
412 W. Broad Street
Bethlehem | Pennsylvania | 18018
(610) 234-3959
(610) 625-3891 Fax

RMaurer@eastburngray.com

Counsel for Plaintiff, Roger Peikin

May 24, 2024